UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
-----------------------------X
ANURAK GOLDSMITH              :
                             :
        v.                   :        NO. 3:03cv01259 (EBB)
                             :
KIMBERLY-CLARK CORPORATION    :
                             :
-----------------------------X
```

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Plaintiff Anurak Goldsmith ("Goldsmith" or "Plaintiff") filed suit against Kimberly-Clark Corporation ("Kimberly-Clark" or "Defendant"), Plaintiff's former employer, alleging (1) wrongful discharge in retaliation for filing a workers' compensation claim, in violation of Connecticut General Statute §31-290a, (2) violations of Connecticut's Unfair Insurance Practices Act ("CUIPA"), Connecticut General Statute § 38a-815, (3) breach of the covenant of good faith and fair dealing, (4) intentional infliction of emotional distress and (5) negligent infliction of emotional distress. Defendant has moved for summary judgment on all counts. Plaintiff, after discovery, does not oppose summary judgment with respect to Count 2. For the following reasons, Defendant's motion is GRANTED on all counts.

### FACTUAL BACKGROUND

The Court sets forth only those facts deemed necessary to an understanding of the issues raised in, and decision rendered on, this Motion. The following factual summary is based on Plaintiff

Goldsmith's Complaint ("Complaint"), Defendant Kimberly-Clark's Local Rule 56(a)1 Statement of Material Facts ["Def.'s 56(a)1 Statement"], and accompanying affidavits, depositions and exhibits and Plaintiff's Local Rule 56(a)2 Statement of Material Facts ["Pl.'s 56(a)2 Statement"]. Consequently, such factual summary does not represent factual findings of the Court.

Defendant is a Delaware corporation with a principal place of business located outside of Connecticut. Def.'s 56(a)1 Statement ¶ 2. Defendant operated a manufacturing facility in New Milford, Connecticut, where it made various products such as Kleenex® tissues and Huggies® diapers, and where it employed Plaintiff as an hourly-paid production worker from 1978 until her termination on April 19, 2001.

Defendant was self-insured for workers' compensation benefits prior to 1998, and was self-insured again in 1999-2000. In 1998, the year in which Plaintiff was injured, Defendant purchased workers compensation insurance from Sentry Insurance Company ["Sentry"] which provided certain coverage for liabilities arising out of work injuries suffered by Defendant's employees in 1998.

**I. Plaintiff's Injury**

In March of 1998, Plaintiff suffered an elbow injury while working on the "Johnson" system at Kimberly-Clark. The "Johnson" system required Plaintiff to open partially sealed cases of Kleenex® tissue products that consisted of single-colored products,

and to create multi-colored cases by mixing boxes of different colored tissues. Plaintiff was also required to lift 30 pound boxes onto a conveyor system. Following this injury, Plaintiff's elbow was examined by Dr. Gevinski, who recommended over the counter pain medication and returned Plaintiff to work without any restrictions. When the pain in her elbow continued, Plaintiff was evaluated by a second physician, Dr. Bazos, who gave her a cortisone shot and recommended that she take a day or two off of work. Plaintiff returned to work, but the pain in her elbow persisted. As of April 20, 1998, Plaintiff stopped going to work.

On or about July 27, 1998, Plaintiff filed a workers' compensation claim for the injury to her right elbow. In August of 1998, Plaintiff went to a third physician for evaluation of her injured elbow. This physician, Dr. Foster, diagnosed Plaintiff's elbow injury as "lateral epicondylitis" and concluded that Plaintiff should avoid working in the "Johnson" system. On December 1, 1998, as part of her workers' compensation case, Plaintiff underwent an "Independent Medical Examination" by a fourth physician, Dr. Tross. Dr. Tross concluded that Plaintiff was a candidate for a surgical procedure on her right elbow. Plaintiff admits that Dr. Tross estimated a failure rate of 30-35% for the procedure he recommended, and further stated that there was a "small probability that she cannot return to her regular work even with successful surgical intervention." Pl's 56(a)2 Statement

¶ 47.

Plaintiff underwent this recommended surgical procedure on February 2, 1999. This surgery was accepted as work related, and Plaintiff concedes that she had no difficulty in receiving worker's compensation benefits for this surgery. Dr. Foster, who performed the surgery, evaluated Plaintiff on five separate occasions following the surgery: on February 10, 1999; March 5, 1999; March 19, 1999; April 9, 1999; and May 25, 1999. In his April 9th evaluation, Dr. Foster concluded that Plaintiff could return to light-duty work in three weeks. In his May 25th evaluation, Dr. Foster noted that Plaintiff had been unable to perform light duty work due to increased pain and soreness and that "she should be covered for this." Murphy Decl., Ex. O. Nonetheless, Dr. Foster concluded that Plaintiff could do the job activities as recommended by Kimberly-Clark, except for lifting and working at a computer. However, in a July 13, 1999 letter to Plaintiff's workers' compensation attorney, Dr. Foster modified his opinion, stating that: "As for her disability period, in her office note of 5-25-99 I did recommend that she consider returning to her light duty work with extreme care not to lift or grasp or do power grips with the right upper extremity. Since that time she has gotten worse. This certainly temporizes my opinion and I feel that only sedentary work, primarily with the use of her left hand, would be indicated for her at this time. If this is not available, then I do not

think work would be advisable for her as her symptoms will only get worse and she will have increasing disability." Murphy Decl., Ex. V.

On June 1, 1999, Plaintiff submitted to a second Independent Medical Evaluation by Dr. Tross as part of her workers' compensation case. Dr. Tross acknowledged that the first surgery had failed, and recommended a repeat second surgery, as "any additional therapy time or any other ministration [was] unlikely to prove positive in ameliorating [Plaintiff's] symptoms." Murphy Decl., Ex. Q. Although Dr. Tross concluded that a revisional lateral epicondylectomy should be undertaken "expeditiously", he also noted that the failure rate for such a secondary procedure was in the "30-35 percent range", and that, should the procedure fail, Plaintiff "would have attained maximum medical improvement and her restrictions would be permanent." Id. In his July 13, 1999 letter to Plaintiff's workers' compensation attorney, Dr. Foster disagreed with Dr. Tross's recommendation for a repeat surgery, stating: "I feel that she would have a similar followup course if she has repeat surgery and I personally do not think this is indicated at this time." Murphy Decl., Ex. V. However, in a July 23, 1999 letter, Dr. Foster wrote: "I have treated her as I have always done in the past, and she is having persistent pain and discomfort that gets worse with work, and I am concerned that I am overlooking something. I feel that another opinion, or at least an Independent

Medical Evaluation, would be appropriate to see if there is anything else that can be done." Murphy Decl., Ex. W.

On July 26, 1999, Plaintiff's workers' compensation attorney requested the Workers' Compensation Commission to consider ordering a Commissioner's examination. Murphy Decl., Ex. X. This request was granted, and Plaintiff was examined by Dr. Gabow on August 24, 1999. Murphy Decl., Ex. Z. Dr. Gabow, in the Commissioner's evaluation, concluded that "not much would be gained in revision surgery for the lateral epicondylitis," and that the Plaintiff "has probably reached maximum medical improvement with regard to this procedure." Id.

Dr. Foster subsequently referred Plaintiff to Dr. Lagratta, who examined Plaintiff on December 14, 1999 and scheduled an "EMG" test of her radial nerve to determine if surgical intervention would be appropriate. Murphy Decl., Ex. CC. On February 24, 2000, Dr. Lagratta concluded that Plaintiff's EMG test was within "normal limits" and specifically stated that he did not recommend another surgical procedure. Murphy Decl., Ex. DD

On April 13, 2000, Dr. Tross saw Plaintiff for a comprehensive re-evaluation and, in an April 21, 2000 letter to Sentry's workers' compensation attorney, Dr. Tross reiterated his belief that Plaintiff would benefit from a second surgery. Murphy Decl., Ex. EE. On October 31, 2000, Plaintiff submitted to a third Independent Medical Evaluation, this time by Dr. Gabow. Dr. Gabow concluded

that a second surgery was both "reasonable and neccessary", stating: "I think everything Dr. Tross brought up in his letter dated 07/14/00 is relevant. I think that he should be allowed to perform surgery on this patient. No guarantees could be made of complete relief of symptoms, though I do think that much of her dorsal forearm pain could be relieved with surgery." Murphy Decl., Ex. FF. Approval for workers' compensation coverage for the second surgery was given on December 1, 2000. Murphy Decl., Ex. GG. Plaintiff underwent the second surgery on January 16, 2001. Dr. Tross, who performed this surgery, continued to treat Plaintiff after the surgery, examining her on five separate occasions between January 16, 2001 and her termination on April 19, 2001. Murphy Decl., Exs. II-MM. Each examination found continuing progress, including gradual modifications of Plaintiff's work restrictions. At the time of Plaintiff's termination from employment, Plaintiff's lifting weight restriction with her injured arm was 20 pounds. Murphy Decl., Ex. MM. However, Defendant asserts, and Plaintiff admits, that there were no hourly-paid positions at Defendant's New Milford facility for which Plaintiff was qualified that could be performed by an employee subject to a lifting restriction of 30 pounds or less. Def.'s 56(a)1 Statement ¶ 76; Pl.'s 56(a)(2) Statement ¶ 76 ("Admitted"); Smolley Dep. at 44:9-46:5. On November 19, 2001, Dr. Tross advanced Plaintiff to a 40-pound lifting weight restriction on her right arm, with no restriction on her

left, uninjured arm. Guendelsberger Decl., Ex. F. Dr. Tross also
cautioned that Plaintiff would require job rotation and work and
"should not be put on the 'Johnson system' in a single position job
function." Id. Defendant admits that an employee of Plaintiff's
education and background with a weight restriction of 40 pounds on
one arm would be physically able to do "just about every job in the
production area at the New Milford Mill except for manufacturing."
Smolley Dep. at 46:8-18.

## II. Work/Termination Discussions

Plaintiff was terminated on April 19, 2001. She submitted an
application for re-employment in January 2002, which was rejected
by the Defendant in a letter dated March 18, 2002. Defendant
alleges two separate company practices relevant to Plaintiff's
termination and Defendant's subsequent refusal to re-hire her.
Plaintiff asserts that she was never made aware of these practices
until after her termination.

Defendant's first policy, according to the declaration and the
deposition testimony of the Defendant's designated representative,
was to terminate any employee who had been out of work for a period
of twelve months, regardless of the reason for his or her absence
(hereinafter "the 12-months termination practice"). Def.'s 56(a)1
Statement ¶ 11; Smolley Decl. ¶ 7. According to the Defendant,
employees who had been absent for six months were personally called
and notified via certified mail that they had six more months of

8

leave before they would be terminated. Smolley Dep. at 56:13-23. The 12-month time period could be extended, on an individual basis, if it appeared that the employee was likely to "come back to their job, and it's going to be within the next few weeks". Smolley Dep. at 65: 6-15. Defendant asserts that the 12-month termination practice was instituted at the New Milford mill in January or February of 1998, and concedes that the policy was never reduced to writing. Smolley Dep. at 55:10-15; 56:6-7. At the time of Plaintiff's termination, Defendant notes that she had been absent from work for 31 months. Smolley Dep., Ex. 17.

Defendant alleges that its second policy was to refuse to consider re-hiring any person who had been terminated involuntarily, regardless of the reason for that termination. Smolley Decl. ¶ 14. According to the Defendant, this policy was developed "in the second quarter of 1998". Smolley Dep. at 93: 18-20.

Plaintiff asserts that she was never made aware of these policies, and challenges whether these policies existed, or were consistently applied, at the time of her employment and termination. Pl's 56(a)2 Statement ¶ 111, Goldsmith Decl. ¶ 3. Specifically, Plaintiff claims that she was not made aware of the first policy until she received a letter on February 4, 2000 (hereinafter "the 2/4/2000 letter"), and that she was not made aware of the second policy until March 18, 2002, when she received

a rejection letter from the Defendant regarding her application for re-employment. Goldsmith Decl. ¶¶¶ 6,14,15. Plaintiff also notes that both policies were "allegedly created shortly before [her] injury, and neither of these policies are memorialized anywhere in writing." Pl's 56(a)2 Statement ¶ 113, <u>citing</u> Smolley Dep. at 54:13-55:15; 56:23-57:23; 93:14-94:2.

As to the second policy, Plaintiff notes that on December 11, 2001, her attorney received a letter from Sentry Attorney Claudia Heyman, who advised that "if [plaintiff] wishes to work for Kimberly-Clark, she must apply as a new hire." Guendelsberger Decl., Ex. D. A subsequent letter from Attorney Heyman to Plaintiff's attorney, dated January 9, 2002, reiterated that "according to policy, [the plaintiff] must re-apply as a new hire." Guendelsberger Decl. Ex. C. As Plaintiff points out, this advice contradicted the Defendant's alleged policy not to re-hire terminated employees. Defendant contends, however, that Attorney Heyman "was never authorized to make any commitments or to give any instructions regarding the Company's employment practices because she was merely the attorney retained by Sentry to defend the workers' compensation claim of Plaintiff." Def.'s 56(a)1 Statement ¶ 98. However, Plaintiff also notes that, in a February 4, 2000 letter, a Kimberly-Clark Human Resources employee also advised her that "[i]f, of course, you are unable to return to work by the above date and/or unable to obtain an extension of that date, you

would be able to re-apply for employment with the Company if and when you can finally return to work." Smolley Decl., Ex. 2. Defendant asserts that this human resources employee was an "entry level" employee with "no authority to set personnel policy or to hire or fire employees". Smolley Suppl. Decl. ¶¶ 4-5.

**DISCUSSION**

## I. Standard of Review

The standard for summary judgment is well established. A moving party is entitled to summary judgment if it demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law", while an issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986); see also Konikoff v. Prudential Ins. Co. Of Am., 234 F.3d 92, 97 (2d Cir. 2000). Upon motion, and following adequate time for discovery, Rule 56(c) requires that summary judgment be entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986). This showing may be made by "pleadings, depositions, answers to interrogatories, and

admissions on file, together with affidavits, if any." FED. R. CIV. P. 56(c).  The evidence of the non-moving party is to be believed, Anderson, 477 U.S. at 255, 106 S.Ct. at 2513, and "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994 (1962).  However, the non-movant may not rest upon the mere allegations or denials of his pleading, see FED. R. CIV. P. 56(e), and "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986).  Instead, the non-moving party "must offer some hard evidence showing that its version of the events is not wholly fanciful." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998).

Summary judgment may be appropriate in employment discrimination cases even though such cases often involve the employer's intent or state of mind.  The "summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." McCloskey v. Union Carbide Corp., 815 F.Supp. 78, 80 (D. Conn. 1993) [quoting Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985), cert. denied, 474 U.S. 829, 106 S.Ct. 91 (1985.].  However, courts should be cautious in granting summary judgment in

these cases, "because direct evidence of an employer's discriminatory intent will rarely be found." <u>Schwapp v. Town of Avon</u>, 118 F.3d 106, 110 (2d Cir. 1997) (internal quotations omitted). In acting with caution, "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." <u>Id</u>. However, at the same time, a plaintiff may not defeat a motion for summary judgment by relying on "purely conclusory allegations of discrimination, absent any concrete particulars." <u>Meiri v. Dacon</u>, 759 F.2d 989, 998 (2d Cir. 1985), <u>cert. denied</u> 474 U.S. 829, 106 S.Ct. 91(1985).

## II. Application of Standard of Review

### A. Violation of Section 31-290(a) (Count 1)

Section 31-290a of the Connecticut General Statutes provides that "[n]o employer who is subject to the provisions of this chapter shall discharge, or cause to be discharged, or in any manner discriminate against any employee because the employee has filed a claim for workers' compensation benefits or otherwise exercised the rights afforded to him pursuant to the provisions of this chapter." C.G.S.A. § 31-290a.

Plaintiff alleges that her termination violated §31-290a because, "after delaying Plaintiff's physical recovery from her work-related injuries by witholding approval of necessary medical treatment for over eighteen months, the Defendant then terminated the Plaintiff's employment due to her extended absence from work."

Complaint ¶ 26. Defendant denies that it had decision making-authority over the administration of Plaintiff's workers' compensation claim. Def.'s 56(a)1 Statement ¶ 41. Furthermore, Defendant alleges that Plaintiff was properly terminated in accordance with the Defendant's 12-month termination policy. Def.'s 56(a)1 Statement ¶ 94.

The burdens of proof in actions brought pursuant to §31-290a was set forth by the Connecticut Supreme Court in Ford v. Blue Cross & Blue Shield of Connecticut, Inc., 216 Conn. 40, 578 A.2d 1054 (1990), adopting the basic allocations of burdens of proof in employment discrimination cases set by the United States Supreme Court in McDonnell Douglas Corporation v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973). First, "[t]he plaintiff bears the initial burden of proving by [a] preponderance of the evidence a *prima facie* case of discrimination." Id. at 802, 93 S.Ct. at 1824. In order to meet this burden, the plaintiff must present evidence that gives rise to an inference of unlawful discrimination. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 1093(1981). Second, if the plaintiff successfully establishes a *prima facie* case, "the burden then shifts to the defendant to rebut the presumption of discrimination by producing evidence of a legitimate, nondiscriminatory reason for its actions." McDonnell Douglas Corporation v. Green, supra. Third, "if the defendant carries this burden of production, the presumption raised by the

14

*prima facie* case is rebutted, and the factual inquiry proceeds to a new level of specificity." <u>Texas Department of Community Affairs v. Burdine</u>, <u>supra</u>, 450 U.S. at 255, 101 S.Ct. at 1094-95. "The plaintiff must then satisfy the burden of persuading the factfinder that the plaintiff was the victim of discrimination either by directly persuading the court or jury that a discriminatory reason more likely than not motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." <u>Id.</u> at 256, 101 S.Ct. at 1095. In order to survive a motion for summary judgment, plaintiff must establish a genuine issue of material fact as to whether the employer's reason for discharging her is false pretext and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision. <u>DeMars v. O'Flynn</u>, 287 F. Supp. 2d 230, 243-44 (W.D.N.Y. 2003)

To establish a *prima facie* case pursuant to Section 31-290a, the plaintiff must satisfy a three-pronged test. <u>See</u> <u>Mele v. City of Hartford</u>, 270 Conn. 751, 769-70, 855 A.2d 196 (2004); <u>Diaz v. Housing Authority</u>, 258 Conn. 724, 730-31, 785 A.2d 192 (2001). The plaintiff must establish that (1) he filed a claim for workers' compensation benefits or otherwise exercised his rights under the Workers' Compensation Act; (2) an employment action disadvantaging the plaintiff occurred; and (3) there is a causal connection between the exercise of the plaintiff's rights under the Workers'

15

Compensation Act and the employment action that disadvantaged the plaintiff. Id. "The burden that an employment discrimination plaintiff must meet in order to defeat summary judgment at the *prima facie* stage is *de minimis*." McClee v. Chrysler Corporation, 109 F.3d 130, 134 (2d Cir. 1997). However, the plaintiff must present some evidence from which a trier of fact could infer that the employer discharged or discriminated against the employee because he or she had exercised his or her rights under the Workers' Compensation Act. Ford v. Blue Cross & Blue Shield of Connecticut, Inc., 216 Conn. at 53-54, 578 A.2d at 1054.

It is undisputed that (1) Plaintiff filed a claim for workers' compensation benefits under the Workers' Compensation Act, See Complaint ¶6, and that (2) Plaintiff suffered an adverse employment action (her termination). However, Plaintiff has not established the necessary causal connection between the exercise of her workers' compensation claim and her termination.

A causal connection between a protected activity and adverse employment action may be established either " indirectly by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant." Johnson v. Palma, 931 F.2d 203, 207 (2d Cir. 1991). Here, Plaintiff's termination came nearly three years after she

filed her workers' compensation claim. Although the Second Circuit has not "drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," Gorman-Bakos v. Cornell Coop. Extension of Schenectady County, 252 F.3d 545, 554 (2d Cir. 2001), a delay of three years would suggest the lack of a causal connection. Compare Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208 (2d Cir. 2001) (time span of weeks between serving of an EEOC complaint on defendant and plaintiff's suspension short enough to permit inference of causal connection) and Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998) (holding discharge less than two months after plaintiff filed a sexual harassment complaint with management and ten days after filing a complaint with state human rights office provided prima facie evidence of a causal connection between protected activity and retaliation) with Hollander v. American Cyanamid Co., 895 F.2d 80, 85-86 (2d Cir. 1990) (affirming summary judgment for employer based on lack of causal connection where three months separated complaint and adverse action).

Plaintiff argues, however, that her protected activity is broader than the filing of her workers' compensation claim in 1998, and includes her "right to receive medical treatment for [her] work related injuries." Pl.'s Br. Summ. J. 25, citing C.G.S. § 31-294d. Plaintiff argues that she exercised this right when she finally underwent her second surgery in January of 2001, and that

Defendant's termination of her three months later provides the temporal proximity required to establish a causal connection. The Court disagrees that any medical treatment Plaintiff received subsequent to filing her workers compensation claim serves as a new date from which temporal proximity would be determined. Plaintiff has offered no case law to support her theory.

A causal connection may also be established *directly* by evidence of retaliatory animus. Johnson v. Palma, supra; see also Sumner v. United States Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990). (emphasis added). Plaintiff asserts that (1) Defendant's threat of termination unless Plaintiff provided information showing that she came under the provisions of the Americans With Disabilities Act ("ADA") and what her medical restrictions would be and (2) Defendant's refusal to advocate for Plaintiff's second surgery and its threats to terminate her are evidence of this animus. Pl.'s Br. Summ. J. 27. The Court again disagrees.

First, Plaintiff has put forth no evidence that Defendant's request for ADA information was motivated by animus. Under the ADA, a "disability" is a physical impairment that "substantially limits one or more ... major life activities." 42 U.S.C. § 12102(2)(A) (1994 ed.). The ADA requires covered entities, including private employers, to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such

covered entity can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A) (1994 ed.); see also § 12111(2). It is insufficient for individuals attempting to prove disability status to merely submit evidence of a medical diagnosis of an impairment. Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 198, 122 S.Ct. 681, 692 (2002). Instead, the ADA requires those "claiming the Act's protection ... to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience ... is substantial." Id. at 198, 122 S.Ct. at 692-93, citing Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 567, 119 S.Ct. 2162, 2169 (1999).

In its February 4, 2000 letter to Plaintiff, Defendant indicated that Plaintiff's leave of absence had exceeded the one-year maximum, and that she would be terminated unless she could show either that she would be able to return to work in a reasonable time period, or that she was covered by the provisions of the ADA, in which case the company would discuss whether reasonable accommodations could be made available. Smolley Decl., Ex. 2. In an August 29, 2000 response, Plaintiff's attorney did not address the ADA, but asked for an extension of Plaintiff's leave upon recovery of her second surgery. Smolley Decl., Ex. 3. At this point, however, Plaintiff's second surgery had not yet been authorized. Defendant responded in a September 11, 2000 letter,

stating that it was inclined to terminate Plaintiff since she had shown no reasonable probability that she would be able to return to work, but that it would be willing to discuss its responsibilities under the ADA once Plaintiff showed that she was covered by the ADA. Smolley Decl. Ex. 4. Plaintiff's attorney subsequently responded in a November 27,2000 letter that Plaintiff was covered by the ADA, and included medical records indicating that Plaintiff could work with a temporary lifting restriction of 15-20 pounds. Smolley Decl., Ex. 9. Defendant responded that, even if Plaintiff were covered by ADA, it could not reasonably accommodate such a restriction.

Plaintiff now asserts that the Defendant's request for ADA information, two months after Plaintiff's second surgery, was "patently absurd". Pl.'s Br. Summ. J. 26. She argues that "it was physically impossible to determine, so soon after surgery and during the recovery period, whether [she] would have a residual disability at all, and, if so, what it would be." Pl.'s Br. Summ. J. 27. Even if this were true, Plaintiff offers no direct evidence that Defendant's request for this information was in retaliation for the exercise of her protected rights. Her conclusory allegations about Defendant's motives, without more, are not enough to sustain her burden. <u>See</u> <u>e.g.</u> <u>Western World Ins. Co. V. Stack Oil, Inc.</u>, 922 F.2d 118, 121 (2d Cir. 1990).

Second, Plaintiff's claim that retaliatory animus can be inferred from Defendant's conduct prior to her second surgery is

20

without merit. Plaintiff argues that, although Defendant was aware that Dr. Tross had recommended a second surgery as early as June 1999, it did nothing to push for its approval. Pl.'s Br. Summ. J. 27. Assuming *arguendo* that Defendant had decision-making authority relating to benefits and coverage administered by Sentry Insurance (an issue that is disputed by the Defendant), three other physicians had concluded that surgery was unnecessary. Thus, there is no evidence of retaliatory animus where, faced with contradictory medical opinions, the majority of which weighed against the second surgery, approval for the second surgery was initially denied.

For all the above reasons, this court finds that there is insufficient evidence from which a reasonable jury could conclude that the adverse employment actions plaintiff suffered were related to the protected activity she engaged in, and plaintiff has not demonstrated a *prima facie* case of retaliation.

Even if the Plaintiff had proven a *prima facie* case of retaliatory discharge, Defendant has rebutted the presumption of discrimination by producing evidence of a legitimate, nondiscriminatory reason for its actions, namely, the fact that Plaintiff had been on leave for thirty-one months. The Defendant's burden at this stage is "one of production, not persuasion; it 'can involve no credibility assessment,'" Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142, 120 S.Ct. 2097, 2106 (2000), quoting St. Mary's Honor Center v. Hicks, 509 U.S. 502, 509, 113

S.Ct. 2742 (1993). Thus, the burden would shift back to the plaintiff to show that the Defendant's explanation was pretext for discrimination. "Pretext may be demonstrated either by the presentation of additional evidence showing that 'the employer's proffered explanation is unworthy of credence,'... or by reliance on the evidence comprising the prima facie case, without more ...." Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 38 (2d Cir. 1994) (quoting Texas Department of Community Affairs v. Burdine, supra 450 U.S. at 256, 101 S.Ct. at 1095).

Here, Plaintiff contends that Defendant's proffered explanation (the twelve-month policy) is not credible, or, alternatively, that retaliation was the real motivation for the Defendant's actions. Pl.'s Br. Summ. J. 28. However, the only evidence the Plaintiff has offered is the fact that (1) the policy was never reduced to writing, (2) the policy came into existence at about the time Plaintiff was injured and (3) the Plaintiff was not terminated within the twelve-month period. These facts do not satisfy the Plaintiff's burden of proving by a preponderance of the evidence that the Defendant's explanation is unworthy of credence.

In sum, because Plaintiff has failed to establish a *prima facie* case of retaliatory discharge, Defendant's motion for summary judgment as to Count 1 is granted.

## B. Breach of Covenant of Good Faith and Fair Dealing (Count 3)

The Connecticut Supreme Court has recognized that every

contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that would injure the right of another to receive the benefits of the agreement. Habetz v. Condon, 224 Conn. 231, 238, 618 A.2d 501 (1992). "The implied covenant of good faith and fair dealing operates to 'fulfill the reasonable expectations of the contracting parties as they presumably intended.'" Rose v. James River Paper Co., 2 F. Supp.2d 245, 255 (D. Conn. 1998), quoting Magnan v. Anaconda Industries, Inc., 193 Conn. 558, 567, 479 A.2d 781 (1984).

Count 3 of Plaintiff's Complaint alleges that Defendant was under a "contractual obligation to compensate employees such as the Plaintiff for their work related injuries, approve necessary medical treatment related thereto, and pay resulting lost wages pursuant to Connecticut's Workers' Compensation Act," and that Defendant breached these obligations by "denying and/or delaying approval for the Second Surgery and requesting repeated medical evaluations of the Plaintiff, despite Defendant's admission of the compensability of said injuries and medical opinions that the Second Surgery was both reasonable and necessary." Complaint ¶¶ 30-31.

First, Plaintiff concedes in her memorandum of law opposing Defendant's motion for summary judgment that no contract or agreement existed between the Plaintiff and the Defendant to provide workers' compensation benefits. Pl.'s Br. Summ. J. 31. Instead, Plaintiff argues that, as an employee of the Defendant, she was an

intended third party beneficiary of the agreement between Defendant and Sentry Insurance to administer her workers' compensation claim and, as such, she has standing to sue for breach of that agreement. Id.

It is well settled that a third-party beneficiary may enforce a contractual obligation without being in privity with the actual parties to the contract. See Gateway Co. v. DiNoia, 232 Conn. 223, 230-31, 654 A.2d 342, 346 (1995). Therefore, "a third-party beneficiary who is not a named obligee in a given contract may sue the obligor for breach." Id. However, even assuming *arguendo* that Plaintiff has successfully established that she is a third-party beneficiary to the insurance policy agreement between Defendant and Sentry Insurance Company, Plaintiff has offered no evidence that Defendant breached this agreement.

Second, Plaintiff has failed to establish that her termination itself was a breach of the implied covenant of good faith and fair dealing. Mere termination of an at-will employee does not violate the covenant. See, e.g., Magnan v. Anaconda Indus., Inc., 193 Conn. 558, 569, 479 A.2d 781, 787 (1984). The burden is on the plaintiff to establish that her dismissal "was for a demonstrably improper purpose, the impropriety of which is derived from a violation of some important public policy." Venterina v. Cummings & Lockwood, 117 F. Supp. 2d 114, 119 (D. Conn. 1999). Moreover, a plaintiff bringing this claim must also establish that she does not otherwise

have an adequate means of vindicating that public policy. Id., citing Bennett v. Beiersdof, Inc., 889 F. Supp. 46,49 (D. Conn. 1995). Thus, even if Plaintiff were able to establish that her termination was due to her workers' compensation case, she has not shown why § 31-290 would not provide an adequate statutory remedy for her claim. Accordingly, Defendant's motion for summary judgment as to Count 3 is granted.

## C. Intentional Infliction of Emotional Distress (Count 5)

Count 5 of Plaintiff's complaint alleges that the Defendant's conduct in terminating her was extreme and outrageous, Complaint ¶ 36, and was done with the intent of causing Plaintiff severe emotional distress. Complaint ¶ 35.

In order to sustain a claim of intentional infliction of emotional distress, the plaintiff must establish that (1) the actor intended to inflict emotional distress, or should have known that emotional distress would be a likely result of his conduct; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct was the cause of the plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was severe. Reed v. Signode Corp., 652 F. Supp. 129, 136 (D. Conn. 1986, citing Peytan v. Ellis, 200 Conn. 243, 253, 510 A.2d 1337, 1342 (1986).

Because plaintiff has failed to establish elements (2) and (4) above, this Court does not address elements (1) and (3).

First, Plaintiff has not shown that Defendant's behavior was

extreme and outrageous. Whether or not a Defendant's conduct was sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine. Appleton v. Board of Education, 254 Conn. 205, 210, 757 A.2d 1059, 1062 (2000); Dobrich v. General Dynamics Corp., Electric Boat Div., 40 F. Supp. 90, 104-05 (D. Conn. 1999); Johnson v. Chesebrough-Pond's USA Co., 918 F. Supp. 543, 552 (D. Conn. 1996). Liability has been found only where the conduct in question has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Restatement (Second) Torts § 46, comment (d), p. 73 (1965).

Plaintiff alleges that the Defendant's termination of her and its subsequent rejection of her application for employment was done in an inconsiderate, embarrassing, and/or humiliating manner. Complaint ¶¶ 35-36. Specifically, Plaintiff states that her termination goes "far beyond a simple firing, insulting conduct, or bad manners", because Defendant "knew that it had delayed [Plaintiff's] medical recovery for eighteen months, and then fired her because she had been out of work too long." Pl.'s Br. Summ. J. 35. Plaintiff describes Defendant's actions as a "calculated effort to humiliate" her, by virtue of the fact that Defendant "still invited [Plaintiff] to apply for a position at Kimberly Clark on three separate occasions, even though it had no intention of

considering her application." Pl.'s Br. Summ. J. 36. Even assuming *arguendo* that these allegations are all true, such conduct cannot be characterized as "beyond all possible bounds of decency." Courts have found behavior that is appreciably more repugnant than what is alleged in the instant case to be insufficient to meet the "extremely high threshold of outrageous and intolerable conduct that is required to sustain a claim for intentional [infliction of] emotional distress." Cowras v. Hard Copy, 56 F. Supp. 2d 207, 210 (D. Conn. 1999) (extreme and outrageous conduct not found where defendant media company aired a videotape of plaintiff's arrest for driving while intoxicated and also falsely asserted during television program that plaintiff filed and then withdrew a claim for police brutality); see also Appelton v. Board of Education, 254 Conn. 205, 211, 757 A.2d 1059, 1063 (2000) (extreme or outrageous conduct not found where plaintiff was subjected to psychiatric evaluations, condescending remarks made by the employer, escorted off the employer's premises by police and forced to resign); Muniz v. Kravis, 59 Conn. App. 704, 709, 757 A.2d 1207 (2000) (defendant's conduct in sending armed guard to notify plaintiff and her husband of termination when husband recovering from surgery not extreme and outrageous).

Thus, when viewing the evidence in the light most favorable to the plaintiff, although the conduct alleged in this case may have been hurtful and/or distressing, it was not extreme and outrageous

as a matter of law.

In addition, Plaintiff has not alleged facts sufficient to establish that she suffered severe emotional distress (the fourth element). Although Plaintiff stated that she experienced "[d]epression, emotional stress, irritability, financial pressure from loss of income, anger and frustration", Pl.'s 56(a)2 Statement ¶ 143, there is no indication that the Plaintiff either sought or received treatment by a doctor or mental health professional for her alleged distress. See Reed v. Signore Corp., 652 F.Supp. 129, 137 (D. Conn. 1986) (holding that plaintiff failed to establish emotional distress as a matter of law because the only evidence of such distress came from his deposition testimony, and he was neither treated nor sought medical assistance for the distress that he allegedly suffered).

For the foregoing reasons, Defendant's motion for summary judgment as to Count 5 is granted.

**D. Negligent Infliction of Emotional Distress (Count 4)**

Count 4 of Plaintiff's complaint alleges that "the Defendant's termination of the Plaintiff and its subsequent rejection of her application for employment was done in an inconsiderate, embarrassing and/or humiliating manner", which the Defendant knew or should have known would subject Plaintiff to an unreasonable risk of emotional distress. Complaint ¶¶ 35-36.

To establish a claim of negligent infliction of emotional

28

distress, a plaintiff must prove the following elements: (1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress. <u>Carrol v. Allstate Ins. Co.</u>, 262 Conn. 433, 444, 815 A.2d 119, 127 (2003).

Termination from employment, whether lawful or unlawful, is usually distressing. <u>See</u>, <u>e.g.</u>, <u>Perodeau v. City of Hartford</u>, 259 Conn. at 757, 792 A.2d at 769 (stating that "it is clear that individuals in the workplace reasonably should expect to experience some level of emotional distress, even significant emotional distress, as a result of conduct in the workplace. There are few things more central to a person's life than a job, and the mere fact of being demoted or denied advancement may be extremely distressing."). Thus, "[I]n cases where [an] employee has been terminated, a finding of a wrongful termination is neither a necessary nor a sufficient predicate for a claim of negligent infliction of emotional distress. The dispositive issue in each case [is] whether the defendant's conduct during the termination process was sufficiently wrongful that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that [that] distress, if it were caused, might result in illness or bodily harm." <u>Perodeau v. City of Hartford</u>, 259 Conn.

729, 751, 792 A.2d 752, 765 (2002). Thus, conduct which gives rise to liability is limited to that which is "sufficiently wrongful", i.e. "particularly egregious." See Perodeau, 259 Conn. at 755, 792 A.2d at 767.

As the Court previously noted, Plaintiff has not alleged facts sufficient to establish that she suffered severe emotional distress. Moreover, she has not established that Defendant's conduct during her termination was "sufficiently wrongful." Plaintiff has put forth no evidentiary support for her claim that Defendant engaged in a "calculated effort to humiliate her". See Armstead v. Stop & Shop Companies, Inc., 3:01cv1489, 2003 WL 1343245, at *6 (D. Conn. March 17, 2003) (finding that "conclusory characterizations such as 'demeaning, derogatory and inhumane' are not sufficient basis for liability on negligent infliction of emotional distress claim"). Even assuming arguendo that Defendant's conduct could be characterized as inconsiderate, as Plaintiff alleges, "mere inconsiderate or precipitous conduct may not suffice". Id, citing Parsons v. United Technologies Corp., 243 Conn. 66, 88-89, 700 A.2d 655, 667 (1997) (affirming striking of claim where employee was terminated and removed from employer's building under security escort), Saloomey v. A Child's Garden, Inc., No. 324092, 1996 WL 278252, at *5 (Conn. Super. April 29, 1996) (striking claim where employee ordered to remove personal belongings and simultaneously questioned about stealing).

## CONCLUSION

For the foregoing reasons, the motion [Doc. No. 27] is granted.


SO ORDERED


_____
ELLEN BREE BURNS
SENIOR U.S. DISTRICT JUDGE


Dated at New Haven, Connecticut this       day of September 2007.